THE HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
8                              AT SEATTLE

9   LARENA HATLEY,                         CASE NO. C21-0820-JCC

10                    Plaintiff,            ORDER

11         v.

12   JOYCE L. MULLAN,

13                    Defendant.

14

15         This matter comes before the Court on the Plaintiff's motion for partial summary

16   judgment (Dkt. No. 63) and Defendant's Rule 12(h)(3)[1] motion (Dkt. No. 67). Having

17   thoroughly considered the record, the parties' briefing, and finding oral argument unnecessary,

18   the Court hereby GRANTS Defendant's motion (Dkt. No. 67) and DENIES Plaintiffs' motion

19   (Dkt. No. 63) as moot for the reasons explained herein.

20   **I.     BACKGROUND[2]**

21         Defendant is a longstanding member of the American Kennel Club. (Dkt. No. 1 at 3.)

22   Through her business, Castlewood Standard Schnauzers, she breeds and sells show-quality

23   Standard Schnauzer puppies. In 2017, Defendant agreed to sell Plaintiff a Standard Schnauzer

24   ─────────────────────

25         [1] Defendant captions his motion as seeking summary judgment. (*See* Dkt. No. 67 at 1.) In
     substance, it is a factual attack on this Court's subject matter jurisdiction. *See Arbaugh v. Y&H
26   Corp.*, 546 U.S. 500, 506 (2006). Therefore, the Court will address it before turning to Plaintiff's
     motion. *See* Fed. R. Civ. P. 12(h)(3).
         [2] Unless otherwise indicated, the facts described below are undisputed.

puppy for $2,500, to be bred by Defendant's dam Rosie. (Dkt. Nos. 63 at 3, 67 at 3; *see* Dkt. No. 63-1 at 1.) In May 2018, Rosie whelped Starr, the puppy at issue. (Dkt. No. 63 at 3.) But Defendant elected to keep Starr and attempted to return the funds received. (Dkt. Nos. 63 at 3, 67 at 3–5.) Plaintiff, not happy with this development and unable to convince Defendant to reconsider, sued Defendant in Contra Costa County Superior Court, seeking, *inter alia*, specific performance of their agreement. (*See* Dkt. No. 17-1.) Prior to judgment issuing in that matter, the parties decided to dismiss the case without prejudice. (Dkt. No. 1 at 3.)

Plaintiff later refiled her case in this Court, based on diversity jurisdiction. (*Id.* at 2–3.) She initially sought a writ of replevin (a demand she later dropped), (*see* Dkt. No. 53 at 2), along with damages and penalties for breach of contract, tort-based claims, and violations of Washington's Consumer Protection Act ("CPA"). (Dkt. No. 1 at 10–19.) After the Court denied Plaintiff's preliminary motion for a writ of replevin, (Dkt. No. 44), it instructed the parties to provide it with summary judgment briefing before proceeding to trial. (Dkt. No. 54.) The parties then filed the instant motions (Dkt. Nos. 63, 67).

Plaintiff seeks partial summary judgment on certain factual issues and legal arguments. (*See* Dkt. No. 63 at 2.) Whereas Defendant challenges this Court's subject matter jurisdiction, specifically, the amount in controversy. (*See* Dkt. No. 67 at 5–15.) Because, as described below, the Court FINDS that, in fact, it lacks subject matter jurisdiction to adjudicate Plaintiff's claims, it need not and cannot address Plaintiff's motion for summary judgment.

II.    **DISCUSSION**

When Plaintiff filed the instant complaint, she asserted that the Court had jurisdiction based on the diversity of the parties and the amount in controversy, which she claimed exceeded $75,000. (*See* Dkt. No. 1 at 2.) Defendant initially challenged this assertion on a facial basis through a Rule 12(b)(1) motion to dismiss, which Judge Peterson recommend be denied. (Dkt. No. 29.) The Court adopted Judge Peterson's unobjected-to Report and Recommendation on the motion. (Dkt. No. 32.) Defendant again challenges this assertion—this time on a factual basis. (*See* Dkt. No. 67 at 5–13.)

As Judge Peterson previously discussed, the Court applies the legal certainty test to determine whether the amount in controversy is satisfied. (*See* Dkt. No. 29 at 3 (citing *Naffe v. Frey*, 789 F.3d 1030, 1039 (9th Cir. 2015)).) Under this standard, the Court must accept the amount in controversy claimed by a plaintiff unless it can declare to a legal certainty that the case is worth less. *See St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938).

But on a factual challenge, such as this one, the Court is *not* limited to the face of the pleadings—it may review any evidence concerning the existence of jurisdiction. *See McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). Although the burden of establishing subject matter jurisdiction falls on Plaintiff—as she is the party seeking federal adjudication of her claims, *see Indus Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990), her burden is not particularly high, as factual issues must be resolved in her favor. *See Edison v. U.S.*, 822 F.3d 510, 517 (9th Cir. 2016). This is far less than a preponderance standard. *Naffe*, 789 F.3d at 1040.

A.      **The CPA is Inapplicable**

In arguing that she satisfies the amount in controversy, Plaintiff relies in large part on attorney fees[3] incurred to date in this case and other damages recoverable through a successful CPA claim. (Dkt. No. 82 at 4–7, 11–12.) But she gives short-shrift to the notion of whether the regime even applies here. The CPA's purpose is to protect the public from unscrupulous businesses. *See Lightfoot v. MacDonald*, 544 P.2d 88, 89 (Wash. 1976). It is not intended to provide an aggrieved plaintiff with a backdoor ticket to federal court.

To bring a successful CPA claim, Plaintiff must establish, at a minimum, that the conduct complained of has the potential to impact the public interest in a meaningful way. *See Hangman*

---

[3] Because, per below, the Court finds that the CPA is not implicated by the conduct at issue here, it need not make a determination as to the reasonableness of those fees. *See* RCW 19.86.090 (providing a mechanism for the recovery of "reasonable attorney's fees"); *see Nordstrom, Inc. v. Tampourlos*, 733 P.2d 208, 212 (Wash. 1987). But the Court notes that, on its face, spending 356 hours of Plaintiff's counsels' time and 57.9 hours of their paralegal's time, to date, (*see* Dkt. No. 78 at 3), on a suit involving a failed $2,500 sale, appears unreasonable, excessive, and unwarranted.

*Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). In determining whether unlawful conduct could implicate the public interest, the Court applies four factors:

> (1) whether the alleged acts were committed in the course of defendant's business; (2) whether the defendant advertised to the public in general; (3) whether the defendant actively solicited this particular plaintiff, indicating potential solicitation of others; (4) whether the plaintiff and defendant have unequal bargaining positions.

*Eye Care Ctr. of Snohomish v. Chemat Tech., Inc.,* 2012 WL 12941686, slip op. at 3 (W.D. Wash. 2012) (citing *Michael v. Mosquera-Lacy*, 200 P.3d 695, 700 (Wash. 2009).) Here, only the first factor implicates the CPA—it is undisputed that Defendant's failure to tender Starr was in the course of Defendant's business.

Based on the remaining factors, the evidence before the Court supports a finding of no public interest impact. This is because Defendant did not advertise her breeding business to the public, did not solicit Plaintiff, and was not in a superior bargaining position relative to Plaintiff. (*See* Dkt. No. 63-3 at 5–6 (Defendant's deposition testimony *submitted by Plaintiff* indicating she sought Defendant out and agreed to wait "at least a couple years" for a puppy from Defendant), 63-2 at 1 (text thread *submitted by Plaintiff* describing a discussion where Plaintiff informs Defendant she intends to "wait for you and Rosie" rather than purchase a puppy from another breeder, even though they presently have an available "show quality female"), 63-10 at 2 (Defendant's deposition testimony *submitted by Plaintiff* indicating that Defendant does not advertise), 63-9 at 13–17 (text strings *submitted by Plaintiff* from Chance Daniels, Plaintiff's spouse, to Defendant threatening legal action), 80 at 2 (recorded conversation *submitted by Plaintiff* where Mr. Daniels informs Defendant that he can "do things" including "throw[ing] money at any problem and make it go away," and will do "whatever it takes" to ensure Defendant delivers Starr to Plaintiff, including forcing her to pay "$50,000 in legal expenses" if necessary), 63-9 at 21–22 (alleged derogatory social media messages *submitted by Plaintiff* from Mr. Daniels directed at Defendant's business).)

Moreover, even if the Court were to find a public interest impact, this is not the end of the

story. Plaintiff must establish unfair or deceptive conduct. RCW 19.86.020. And while Plaintiff argues that Defendant's conduct was unfair or deceptive "on its face," (Dkt. No. 63 at 2; *see* Dkt. No. 81 at 5–6), Plaintiff provides no authority for this proposition. (*See generally id.*); *see, e.g.*, *Myrick v. U.S.*, 217 F. Supp. 2d 979, 982 (D. Ariz. 2002), *aff'd*, 70 F. App'x 956 (9th Cir. 2003) (declining to "consider arguments made without legal support"). From the Court's perspective, a breach of contract may be unlawful, but it is not *per se* unfair or deceptive. This is particularly so here, where Defendant attempted to return the amount paid—an offer Plaintiff seemingly refused to accept. (*See* Dkt. No. 80-1 at 1.)

### B.      No Reliable Evidence Suggests Consequential Damages Exceed $75,000

Without the benefit of a viable CPA claim, Plaintiff must provide evidence that her actual damages exceed $75,000. 28 U.S.C. § 1332(a). To do so, she relies on consequential damages, particularly lost profits. (Dkt. No. 82 at 7–11.) Whether such damages are even appropriate in this, a breach of contract case, is an issue the Court need not address. *See Larsen v. Walton Plywood Co.*, 390 P.2d 677, 686 (Wash. 1964) (lost profits are only recoverable when "(1) they are within the contemplation of the parties at the time the contract was made, (2) they are the proximate result of defendant's breach, and (3) they are proven with reasonable certainty"). This is because Plaintiff fails to present any reliable evidence that, to the extent lost profits are recoverable here, they could come anywhere near $75,000. *See Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 711 (9th Cir. 1990) (requiring "tangible evidence rather than mere speculation or hypotheses").

Plaintiff offers her own self-serving declaration, indicating she could have generated between $57,795 and $93,795 in profits over Starr's life, had she bred her. (Dkt. No. 79 at 8–9.) But Plaintiff provides no evidence to suggest that Plaintiff previously bred show puppies or has the expertise to opine on Starr's value. And while she does include a report from Jill Kellser-Miller estimating possible gross revenue from Starr over her life between $30,000–$84,000, (*see* Dkt. No. 78-1 at 13), even if the Court were to credit Ms. Kellser-Miller as an expert on the issue, which is not entirely clear given her reliance on Plaintiff's counsel for the numbers that

went into her estimate, (*see* Dkt. No. 86-1 at 2–3), Ms. Kellser-Miller's report indicates that it cannot be relied on to establish value. (*See* Dkt. No. 78-1 at 12–13.) This is because of the speculative nature of veterinary and other expenses. (*Id.*) However, Plaintiff herself estimates those expenses to be $32,205. (Dkt. No. 79 at 9.) So, at best, applying the high end of the gross revenue estimated by Ms. Kellser-Miller to the expenses estimated by Plaintiff results in net lost profits of $51,795 ($84,000 less $32,205)—far less than $75,000. Moreover, as Ms. Kellser-Miller later indicated in her deposition, these numbers must be taken "with a grain of salt." (Dkt. No. 2.)[4]

Finally, Plaintiff argues that legal fees incurred prior to filing this case should be considered as consequential damages. (Dkt. No. 82 at 11.) Her argument is that, if not for incurring those fees, Plaintiff would not have discovered the fraudulent and deceptive nature of Defendant's conduct. (*Id.*) But as the Court noted above, *see supra* Part II.A., it is not clear to the Court how the allegations in this case rise to the level of a fraudulent and deceptive business practice, rather than simply a change of heart. Regardless, Plaintiff's argument strains this Court's credulity. While she provides citation supporting the notion that past legal fees may be recoverable in a RICO context, (*id.* (citing *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1105 (2d Cir. 1988)), she provides no citation to support the notion that they are recoverable in a breach of contract case governed by Washington law.

Therefore, the Court FINDS, to a legal certainty, that this case is worth far less than $75,000.

## III.   CONCLUSION

For the foregoing reasons, Defendant's Rule 12(h)(3) motion (Dkt. No. 67) is GRANTED and Plaintiff's summary judgment motion (Dkt. No. 63) is DENIED as moot. This case is DISMISSED without prejudice.

---

[4] Nor is it lost on the Court that, in Ms. Kellser-Miller's opinion, (1) Starr *is not* show quality, (2) it is unclear if she ever could have been show quality, (3) and based on her current condition, Starr's current breeding value is "zero." (Dkt. No. 78-1 at 13–16.)

DATED this 15th day of June 2023.

John C. Coughenour
UNITED STATES DISTRICT JUDGE